JANOWITZ, ET AL. *v.* SLAGLE, ET AL.

[No. 237, September Term, 1967.]

*Decided May 28, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Thomas Paul Raimondi,* with whom was *Jerome A. Dashner* on the brief, for appellants.

*Philip Fiorello* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Joseph Janowitz, Senior, a resident of Baltimore City, died 10 September 1963. His children are at odds over the division of his property. This opinion will be more easily understood if, first, we identify those concerned.

Father — Joseph Janowitz, Senior

Joseph — Joseph Janowitz, Junior, an appellant, one of the children, the husband of Helen

Helen — Helen Janowitz, an appellant, the wife of Joseph

Raymond — Raymond Janowitz (died 7 February 1965), one of the children, the husband of Margaret

Margaret — Margaret Janowitz, an appellant, the widow of Raymond

Regina — Regina Janowitz Slagle, an appellee, one of the children

Edward — Edward Janowitz, an appellee, one of the children

Leonard   —Leonard Paul Janowitz, an appellee, one of the children

Georgia   —Georgia Janowitz (died 5 March 1964), widow of the father, the stepmother of the 5 Janowitz children

Early in August 1963 the father was taken to a hospital and Georgia, an arthritic, was placed in a nursing home. When the children were told that the father would not recover from his illness they held a meeting, in mid-August, at Regina's house, to discuss what steps should be taken to provide care for the father and Georgia. While they agreed to assume equally the obligation of providing whatever care might become necessary they decided to exhaust the assets of the father before using any of their own. It was agreed that Raymond would take over the bank account to facilitate withdrawals therefrom. The house, 4205 Parkwood Avenue, was owned by the father and Georgia as tenants by the entireties. They agreed that a few more names should be added to the deed to expedite the sale of the house, if a sale became necessary. They agreed also to share in the upkeep of the house until it might be sold.

Raymond assumed control of the bank account and, it might be noted, there seems to have been no impropriety in his disbursement of the money. Soon after the death of the father Regina, Raymond and Ambrose J. Meyer, Esq., who had been the father's attorney, went to the nursing home to discuss with Georgia the addition of the names of some of the children to the deed. The record is silent as to what may have been said. However, two deeds were prepared, presumably by Mr. Meyer, one conveying the property to him and the other reconveying it to Georgia, Raymond and Joseph, as *joint tenants*. Georgia and Mr. Meyer executed these deeds on 30 September 1963.

In March, 1964, a few weeks after Georgia's death, Regina and her 4 brothers held another meeting, this time at the father's house. Since no mention was made of the bank account we shall assume there was nothing left. The disposition of the house was their chief concern. They agreed to sell it and divide the avails. Regina testified that "Joseph said in most emphatic terms that no matter how big or how little they will be divided

equally in five ways." Leonard quoted Joseph as saying that "regardless of how large or how small, definitely it [the avails] will go five ways down the middle."

There is evidence that each one of the children contributed services of some value to the care of the sick and the maintenance of the house. Regina, for instance, sold some of the furniture and made herself available to show the house to prospective customers; Edward and Leonard helped build a new porch and, from time to time, cut the grass and clipped the hedge.

Early in September, 6 months after Georgia's death, Raymond and Joseph, the surviving joint tenants, conveyed the property to Mr. Meyer who immediately reconveyed it to them as *tenants in common.*

The property was sold not long thereafter for $10,000. The closing was held on 5 January 1965. Apparently the settlement checks were made out ½ to Joseph and Helen and ½ to Raymond and Margaret. At or about the time of settlement Joseph told Regina that Helen "was giving him a problem as far as signing the check, that she was demanding a good portion of the check and that he couldn't handle the situation, that he needed time."

Late in April, 1965, Regina received from Margaret (2 months after Raymond's death) a check for $517.26. Regina's version of the circumstances, nowhere denied, follows:

"* * * on the first occasion, she called me to tell me she was willing to comply with her husband's agreement to divide the property five ways but that we would have to wait until her husband succumbed because he was getting progressively worse at this period. She called me later, after he died, to tell me she had settled all of his affairs, his medical bills and all the affairs that arose and she was now ready to settle the house and divide it according to the agreement but that she was told by Helen that Helen would withhold $2700.00 to pay off her mortgage, in which case, Margaret said she would withhold $2700.00, so we

received $517.26, which was, I assume the dividing of
the remainder, after the $2700.00 was withheld."

Leonard and Edward each received $517.26 from Margaret.
Leonard said Joseph told him he needed "more time before
settling up the actual division" because he had a "conflict with
his wife."

Joseph, called as a witness by the plaintiffs (appellees), said
he received $4300 at the closing, after the sale of the house.
Asked if he "did, in fact, make a promise at the meeting to
make a distribution" to Regina and his brothers, he confessed
that he did make such a promise.

Regina, Edward and Leonard filed their petition for a declar-
atory decree in October 1965. The hearing was held in April,
1967. The chancellor, on 16 May 1967, declared them to be
entitled to "an equitable vested interest of one-fifth each in
the remaining assets" of the father and Georgia. He gave the
parties 30 days "to arrive at an accounting" and, upon their
failure to do so, he indicated he would refer the case to the
Court Auditor. They agreed to an accounting and on 25 August
1967 he signed another decree ordering judgment, in the amount
of $4884.42, to be entered in favor of Regina, Edward and
Leonard against Joseph, Helen and Margaret. Appellants con-
tend the chancellor lost jurisdiction to pass the second decree
when the appeal was taken on 1 June 1967. *Collier v. Collier,*
182 Md. 82, 32 A. 2d 469 (1943). This we must reject as
frivolous. The chancellor was simply making specific what he
had already decided and the parties had agreed that the figures
were correct.

We see no reason for making a mountain out of this mole-
hill. What the 5 children intended and what they agreed to do
is entirely clear. Regina, Leonard and Edward thereafter did
everything they had agreed to do. Indeed, this is denied only in
the answers to the petition. Margaret's partial payments to
Regina, Edward and Leonard amount to a clear, if vicarious,
affirmation of the agreement although her decision to withhold
$2700, because Helen had done so, is a stunning bit of illogic.
The record strongly suggests that poor Joseph, had he been
the master of his own household, would have been quite content

to divide the funds in his possession. He admitted that at the March 1964 meeting he agreed to an equal division.

Appellants take somewhat inconsistent positions. They argue that Georgia intended to make a gift of the property to Raymond and Joseph only but the evidence does not support such a notion. Regina was present on the one occasion the matter was discussed with Georgia and she made no mention of it. Raymond, in his lifetime, appears not to have considered he had a half rather than a fifth interest in the property. Joseph's testimony rebuts the idea of a gift. On the other hand, they appear to rely upon a failure of consideration, insisting that neither Regina, Edward nor Leonard "offered or gave any contributions which would have entitled them to any interest" in Georgia's property.

The Statute of Frauds enters the case but only tangentially. Apart from the matter of part performance, of which there is considerable evidence, we think the record contains testimony, coming in without proper objection, sufficient to support the chancellor's finding that the parties did make the earlier mentioned agreement. And, as we have said, there is Joseph's admission that a distribution was agreed to, at least by him. In our judgment, *Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905 (1945), *Dove v. White,* 211 Md. 228, 126 A. 2d 835 (1956), and *Pollin v. Perkins,* 223 Md. 532, 165 A. 2d 908 (1960), are controlling here and since the decision of the chancellor does not run counter to the rule of those cases, it will be affirmed. Cf. *Lambdin v. Przyborowski,* 250 Md. 108, 242 A. 2d 150 (1968).

*Decree affirmed. Costs to be paid by the appellants.*