## ROTHMAN ET AL. *v.* NATIONAL MUTUAL INSURANCE COMPANY OF THE DISTRICT OF COLUMBIA

[No. 80, October Term, 1950.]

*Decided February 8, 1951.*

174

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Samuel K. Dennis* and *Nathan Hamburger,* for appellants.

*Theodore Sherbow,* with whom was *James J. Lindsay,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

William H. Rothman, Irving K. Edelstein and Max Rothman, appellants, trading as Greyhound Cab in Baltimore City, were sued by National Mutual Insurance Company of the District of Columbia, (National), appellee, for failure to pay short rate premiums totaling $8,319.08, which resulted from cancellation by Greyhound of liability insurance on 74 taxicabs, written by appellee. From a judgment for that amount in favor of the appellee, the appellants appeal.

On April 1st, 1946, Greyhound Cab, operating 76 cabs, purchased liability insurance from National to cover its 76 cabs. Article 23, Sections 362 and 363 of the Annotated Code of Maryland make it necessary for the owner of every taxicab to take out liability insurance before operating in any town or city in Maryland with a population in excess of 50,000. The property covered in the policy was as follows: "Description of the automobile; 76 Taxicabs, Cabs No. 1 to 76 (inclusive)". Before purchasing this insurance, Mr. William H. Rothman, (Mr. Rothman), the general manager of the company and a partner in Greyhound, looked around to see where he could get the cheapest premium rates and finally decided to buy the policy from National. The policy issued was a National Standard Automobile Insurance

policy, the total premium for basic coverage being $31,920. The normal cancellation clause in a standard automobile contract provides for a five day written cancellation notice by the insurance company. The policy period was "from April 1st, 1946, to December 31st, 1946". The policy also provided that when one of the automobiles insured was withdrawn from normal use because of breakdown, repair, servicing, loss or destruction, the insurance on the automobile would be applied to another automobile not so owned while temporarily used as a substitute for such automobile. It also provided that if the named assured acquired ownership of another automobile and notified the company within thirty days following the date of delivery to him, for an additional premium, the insurance was transferred to such other automobile as of the delivery date, with certain conditions. Mr. Rothman testified that two or three months after the policy was in effect, he repeatedly requested National, orally, to cancel the policy because he claimed that National, in screening drivers seeking employment with Greyhound, diverted them to the Sun Cab Company. Appellee denied it diverted drivers to other taxicab companies. However, Mr. Rothman did not put this cancellation in writing.

Shortly before August, 1946, Mr. Rothman began to discuss with a representative of the Public Service Mutual Insurance Company the possibility of insuring these 76 cabs with that company in an effort to obtain insurance on which Greyhound would be required to pay a smaller premium rate. Mr. Rothman asked advice from an agent of the Public Service Mutual and other persons, how he could keep from paying the short rate on the National policy if he took insurance on the taxicabs with the Public Service Mutual. He said he requested advice "about how we could get out of this dilemma. This was a dilemma, we were stuck, we didn't know how to get out of it and I asked everyone that knew anything about insurance, including my attorney." He said he received advice from the insurance carriers, not Na-

tional, as well as his attorneys "that we had a definite right to cancel out under our contract provided we held on to a car. Now, as far as going into it and saying that we did something that was out of whack, we didn't do anything. I don't mind telling you here, Mr. Lindsay, that we felt that if we were stuck we'd probably have to pay for it and gone on with the thing. It was just a bad deal, but as long as there was a way out, I was looking for the way out. I make no bones about it." He later testified: "I told you before, I make no bones about it. We tried to get out of the predicament. We had a dilemma here. We wanted to get out any way at all." On August 1st, 1946, Public Service Mutual issued a policy of liability insurance to Greyhound for the 76 cabs, effective immediately. The total annual premium for basic coverage was a saving of $4,560 per year to Greyhound, compared with the premium on the National policy.

On August 10th, 1946, the attorney for Greyhound wrote a letter to Mr. Rosenberg of the Public Service Mutual Insurance Company, which contained the following: "There should be an endorsement providing that if we are short rated on our present policy, that we will be given credit on the premium for the difference between the *pro rata* and short rate charges." On August 13th, 1946, Mr. Rosenberg replied in a letter in which he stated, among other things: "There will be No provision for guarantee on our part for the penalties accepted by the insured under another contract." On August 26th, 1946, Mr. Rothman wrote a letter to National in which he said: "Please let us have an endorsement excluding from the policy cabs Nos. 2 to 76 inclusive, effective midnight, August 31st, but retaining taxicab No. 1." On August 28th, 1946, National wrote to Mr. Rothman that his letter could be interpreted in no other way than as a cancellation by Greyhound of 99% of the policy without specifically requesting cancellation, and that National considered the request for the endorsement in the letter of August 26th as a request for cancellation

of 99% of Greyhound's taxicab coverage. The letter further stated: "This request for cancellation is covered by an endorsement in the policy making you liable for short rate premium on the taxicabs so cancelled. This is taxicab insurance and cabs cannot be operated in Baltimore without insurance coverage. You know as well as we do that you intend to cover these taxicabs in another company. We are enclosing the endorsement as requested, a copy of which is being forwarded to the Public Service Commission and the Commissioner of Motor Vehicles." The endorsement enclosed with that letter stated that it was understood and agreed that the policy shall cease to cover all taxicabs described in the policy or any endorsement thereof and is extended to cover only the one taxicab described.

On August 30th, 1946, Mr. Rothman wrote a letter to National asking them to add to the policy, in addition to taxicab No. 1, taxicab No. 2. On August 31st, 1946, National acknowledged receipt of this letter and said that in compliance with that request, they were attaching another endorsement to the policy. The letter stated: "Please be advised that in compliance with this request, the Company is in no wise retracting or withdrawing from its position as outlined in its letter to you of August 28th, 1946. The only change in the status is the percentage of the policy cancelled by you." With that letter, a special endorsement was attached, which stated: "It is hereby understood and agreed that the policy to which this endorsemenot is attached, shall cease to cover all taxicabs described in the policy or any endorsement thereof and extended to cover only the taxicabs described as follows." The two taxicabs which Greyhound desired covered were specifically described in that endorsement. On August 30th, 1946, Greyhound, having recently acquired 38 new cabs, insured all of its 114 cabs, including the 75 it requested on August 26th eliminated from National coverage, by a policy written by the Public Service Mutual Insurance Company.

Thereafter, on September 9th, 1946, National wrote a letter to Rothman in which they said, among other things: "On August 26th, 1946, by letter you requested that all taxicabs insured under our policy be excluded except taxicab No. 1. On August 30th, 1946, by letter you requested that taxicab No. 2 be added to the policy. We notified in reply to both letters that we considered these requests a cancellation by you of the proportionate share of your policy coverage without specifically requesting cancellation. * * * We are enclosing herewith our bill for short rate premium on the proportionate share of the policy coverage cancelled by you and you are hereby given notice of cancellation on the remaining percentage of your policy coverage. This cancellation is in accordance with the terms of the amended endorsement covering such cancellation, to become effective 12:01 midnight, November 10th, 1946." The Vice-President of National testified that from time to time while the policy was in effect certain taxicabs were eliminated from the policy and other taxicabs substituted in place of the original under the substitution clause. He also admitted that after August 31st, 1946, this policy of insurance continued, but it only covered Cab No. 1 and Cab No 2. He also admitted that the policy remained in effect on those two taxicabs until 12:01 A. M. on November 10th, 1946.

Upon failure of Greyhound to pay the short rate premium suit was filed by National containing the common counts and a special count, to which Greyhound demurred. Upon overruling of the demurrer, Greyhound filed the general issue pleas and a special plea and the case proceeded to trial before a jury. From a judgment for the amount of $8,319.08, the amount claimed by National, Greyhound appeals. The appeal comes to this Court from the refusal of the demurrer prayer of the appellants and the overruling of their motion for a judgment N. O. V. The question before this Court is whether the withdrawal of the 74 taxicabs from the liability insurance policy was a cancellation of the policy

by the appellants within the provision of the endorsement containing the special cancellation clause, which made the short rate premium applicable as to the cancelled taxicabs. There is no dispute in this case that, if the short rate premium applies, $8,319.08 is the correct amount.

The special cancellation endorsement follows: "In consideration of the premium paid under this policy, it is understood and agreed that Condition 17—Cancellation, is hereby amended: 'The policy may be cancelled by the Company, by mailing to the named assured, to the address shown on the policy, written notice of not less than sixty (60) days thereafter such cancellation shall become effective, and if canceled by the Company earned premium shall be computed *pro rata*. If the named assured cancels before the expiration date of this policy and a three (3) months' renewal thereof to March 31st, 1947, or one year from the effective date of this policy, premium shall be computed in accordance with the customary short rate table and procedure on an annual premium basis from April 1st, 1946 to March 31st, 1947.' "

"With respect to insurance policies especially, the term 'cancellation' is habitually used to mean discharge, whether or not there is involved any dealing with the document. This usually takes the form of termination of the contract of insurance pursuant to conditions in the cancellation clause of the insurance policy." *Williston on Contracts*, § 1878. If this insurance policy is in all respects an entire contract it could not be partially cancelled. *Stiegler v. Eureka Insurance Co.*, 146 Md. 629, 643, 127 A. 397. Conversely, if this insurance policy is serverable as to each cab it could be cancelled severably by withdrawing cabs from the policy.

In *Dugan v. Anderson*, 36 Md. 567, it is said at page 585: "Where an agreement embraces a number of distinct subjects, which admit of being separately executed and closed, the general rule is that it shall be taken distributively, and each subject be considered as forming

the matter of a separate agreement after it is so closed." In *Bowman v. Franklin Fire Ins. Co.*, 40 Md. 620, it was held that a policy of fire insurance taken out on machinery and a building was entire as the consideration for the policy was entire. See also *Morrison v. Baechtold*, 93 Md. 319, 48 A. 926; *Joffe v. Niagara Fire Ins. co.*, 116 Md. 155, 164, 81 A. 281, 51 L. R. A., N. S., 1047. It was held in *Broumel v. Rayner*, 68 Md. 47, at page 50, 11 A. 833, at page 834, that whether a contract was entire or divisible, depends on its terms "and in order to arrive at a correct construction due regard must be had to the intention of the contracting parties as revealed by the language which they have employed and the subject matter to which it has reference." *Olmstead v. Bach*, 78 Md. 132, 144, 27 A. 501, 22 L. R. A. 74. As to divisible contracts of insurance see *Niagara Fire Insurance Co. v. Wilkerson*, 150 Okl. 123, 300 P. 686. In *Wieczorek v. Rochester American Ins. Co.*, 62 S. D. 216, 252 N. W. 639, it was held that where separate crops, insured against hail, were so situated that the risk on each crop was distinct from the others, the hail insurance policy was divisible. See also *Jensen v. Lincoln Hail Ins. Co.*, 125 Neb. 87, 249 N. W. 94. In *Madden v. Reeve*, 230 Wis. 468, 283 N. W. 319, the automobile liability policy covered a fleet of trucks, each truck being particularly described in a rider attached to the policy, as in the instant case. The court there held that the insurance could be cancelled as to a single truck.

On the question whether the policy before us is severable, there is a provision therein that: "When two or more automobiles are insured hereunder, the terms of this policy shall apply *separately to each* but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability, under coverages A and B." (Italics supplied). Also the premiums were rated and apportioned at $35.00 per month per cab. This was later increased by $3.50 per cab per month when the coverage was increased. The

consideration was therefore not entire but severable as each cab was rated separately.

The insurance policy being severable, could be severably cancelled. It is therefore evident that the word "cancels" in the special endorsement, *supra,* referred not only to the cancellation of the policy as a whole by the withdrawal of all the cabs, but also to a severable cancellation when less than the whole number of cabs were withdrawn and not replaced by others, in which case the "customary short rate table" applied to the cabs withdrawn.

There was no dispute as to the facts or permissible inferences in this case. Where the facts are uncontroverted or undisputed only a question of law is presented. The question here presented was clearly one of law for the court. In this case, a verdict should have been instructed for the plaintiff. *Dunstan v. Bethlehem Steel Co.,* 187 Md. 571, 578, 51 A. 2d 288, and cases there cited. *Vogelsang v. Sehlhorst,* 194 Md. 413, 419-420, 71 A. 2d 295, 298. It is therefore unnecessary that we pass upon the court's action on the prayers or on the instruction to the jury. As the verdict and judgment are the same as that which should have been instructed, the judgment will be affirmed.

*Judgment affirmed, with costs.*