552 A.2d 51

**Allan PEARLSTEIN, et ux.**

v.

**MARYLAND DEPOSIT INSURANCE FUND.**

**No. 951, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Jan. 13, 1989.

</div>

9

James A. Rothschild (Constance D. Burton and Anderson, Coe & King, on the brief) Baltimore, for appellants.

Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Omar Melehy, Staff Atty., on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and ROSALYN B. BELL, JJ.

BISHOP, Judge.

The appellants, Allan and Rosemary Pearlstein, appeal from a judgment of the Circuit Court for Baltimore City (Judge Edward J. Angeletti presiding), denying their Motion to Enforce Settlement against the appellee, Maryland Deposit Insurance Fund Corporation ("MDIF").

## FACTS

On July 31, 1985, MDIF, as conservator of Old Court Savings and Loan, Inc., ("Old Court"), filed a complaint in the Circuit Court for Baltimore City against all officers and directors of Old Court, including Allan Pearlstein as *de facto* director, and both Mr. and Mrs. Pearlstein as partners in various Old Court affiliates. The complaint charged all defendants with, *inter alia*, fraudulent misappropriation of Old Court funds, and breach of fiduciary duty to the corporation. Appellee requested compensatory and punitive damages, and also moved for an interlocutory order enjoining all defendants from transferring or otherwise encumbering any assets of Old Court or Old Court affiliates.

In 1986, in meetings and through written correspondence, the parties began serious settlement negotiations. On December 22, 1986, MDIF sent a letter to appellants which summarized the basic terms of the proposed agreement as the parties understood it at that time. Some of the provisions of that letter follow:

This letter sets forth the terms of the settlement agreement negotiated between MDIF and Mr. and Mrs. Pearlstein. It is understood, however, that formal settlement papers will be prepared and executed and submitted to Judge Kaplan [1] for the Court's approval. This letter merely sets forth the basic terms of the agreement....

No money will be set aside to be used to pay present or contemplated attorneys fees. As Shale [Stiller, attorney

---

1. The Maryland Court of Appeals appointed Judge Kaplan to adjudicate all claims arising from the failure of Old Court.

for MDIF] stated in his letter of November 17, we believe that it would not be unfair to require Mr. Pearlstein to take any money which he requires for working capital or to pay expenses, including attorneys fees, out of Sylvania Shoe, or out of his salary. . . .

As we discussed, the formal settlement papers will contain a number of additional terms typical of those which have been included in our settlement agreements with other defendants. Thus, for example, Mr. and Mrs. Pearlstein will provide detailed, updated financial information, including a complete schedule of all their assets, and will cooperate fully in assigning assets to MDIF. Further, all parties will do all that is necessary to effectuate a final settlement as promptly as possible.

Would you please transmit this letter to Mr. and Mrs. Pearlstein for their execution, and return the signed original to me as promptly as possible. (footnote added).

Appellants never signed this letter. Moreover, notwithstanding the January 2, 1987 settlement conference before Judge Kaplan, the parties continued to draft conflicting versions of the proposed agreement, and to dispute several provisions within these drafts, as well as other matters. A synopsis of the primary areas of disagreement over the settlement is as follows.

First, MDIF insisted on including its version of paragraph 9 in the agreement. Its draft provided as follows:

*Continuing Access to Financial Records; Cash Payments*

Allan, Rosemary, and The Partnership agree to permit MDIF to inspect all of their financial records (and the financial records of any entity under their direct or indirect control) of any kind or nature *for a period of three years after the date of this Agreement* in order to verify that the warranties and representatives contained in this Agreement are true. [In addition, Allan agrees that if he is ever incarcerated, for a period of three years after he is ultimately released from the correctional system, he will permit MDIF to inspect all of his financial records (and

the financial records of any entity under his direct or indirect control) of any kind or nature in order to verify that the warranties and representations contained in this Agreement are true. Allan and Rosemary also agree that for a minimum of three years after this Agreement is executed and extending until three years have elapsed after Allan is ultimately released from any correctional system, neither of them will receive or disburse any payment of cash in any transaction of more than Five Hundred Dollars ($500).] (emphasis added).

Appellants' version of this paragraph stated in contrast:

*Continuing Access to Financial Records; Cash Payments.*

Upon reasonable notice to the Pearlstein Defendants and their attorneys, Allan, Rosemary and the Partnership agree to permit MDIF to inspect all of their personal financial records of any kind or nature *for a period of one year after the date of this Agreement* in order to verify that the warranties and representations contained in this Agreement are true. (emphasis added).

Second, appellants wanted to pay legal fees for Mr. Pearlstein's criminal trial from the attorney's escrow account.[2] MDIF insisted that these fees come from either Mr. Pearlstein's remaining interest in Sylvania Shoe Company or from his salary. Appellants nonetheless paid the fees from the escrow account. MDIF contended that this payment violated what had been a "fundamental tenet of [the] settlement proposal for several months."

Third, MDIF initially agreed to allow Mr. Pearlstein to keep his interest in the Adams County Partnership, and requested an appraisal of all partnership properties. Upon receipt of the appraisal, MDIF noticed that certain partnership property had been excluded from it; MDIF requested

---

**2.** It appears from the record that there was an escrow account out of which Pearlstein's attorney was receiving fees. The dispute involved in the settlement was whether the fees for the defense of Pearlstein would be paid from the account.

that appellants furnish the omitted information. Upon appellants' failure to do so, and in response to several other of appellants' actions which it found objectionable, MDIF retracted its agreement as regards Pearlstein's partnership interest.

Fourth, on August 25, 1987, appellants proposed new settlement terms to MDIF. Pearlstein offered to assign his stock in Sylvania Shoe Company and his interest in Adams County Partnership, subject to MDIF's signing an option to purchase which would give appellants a right to repurchase. MDIF promptly communicated its rejection of appellants' offer, stating that the two properties in question should have been assigned to it as restitution, as it had proposed earlier in court. MDIF rejected the provision for repurchase and proposed different repurchase terms.

On October 16, 1987, (nine months and 14 days after the alleged settlement date) appellants filed a Motion to Enforce Settlement Agreement, arguing essentially that an executory accord had been reached between the parties at the January 2, 1987 settlement conference, that the key terms of the agreement were stated in MDIF's letter of December 22, 1986, and that MDIF had breached the agreement by refusing to allow Pearlstein to keep his Adams County realty as it originally agreed.

MDIF opposed the motion to enforce settlement. It asserted that the disagreements evidenced in the written correspondence between the parties following the conference established indisputably that there had been no settlement. MDIF also contended that the December 22 letter upon which appellants relied made clear that it was subject to the addition of other terms and to the execution of formal papers, and that they had themselves breached the terms of the letter by depleting the escrow account.

At appellants' request, on May 31, 1988, Judge Kaplan recused himself from deciding the motion to enforce settlement, and referred the matter to Judge Edward J. Angeletti for determination. On June 8, 1988, appellants moved to

disqualify all judges of the Eighth Judicial Circuit (Baltimore City) from hearing the motion to enforce settlement. They argued that since Judge Kaplan, the Administrative Judge of the Eighth Circuit would be a witness concerning the January 2 settlement conference, any other judge in the circuit would be biased in favor of his testimony. Judge Angeletti denied the motion, stating:

> Judge Kaplan is not now, nor has he ever been, in the position of being a fact witness for either side in this proceeding....

> Judge Kaplan will not be permitted to be called as a witness by either party in this matter. Judge Kaplan's sole contribution to this particular motion is his statement that a settlement had "almost" been reached but that it had not been completed. That statement very clearly is a statement of his legal opinion based on his knowledge of the entire subject matter. Under those circumstances, his opinion is absolutely and totally irrelevant as to whether or not there is in fact a settlement between the parties that is susceptible of enforcement.

A hearing on appellants' motion was held on June 21, 1988, before Judge Angeletti. The court allowed counsel to argue the motion. Appellants' counsel was also allowed to proffer the testimony of various potential witnesses who were present at the January 2 conference in order to prove that an agreement had been reached. The court also admitted into evidence all of the affidavits and documents previously filed by the parties. The court, however, refused to allow any witnesses to testify, or to allow counsel to reiterate arguments previously made:

> [COURT] On the issue of taking parol evidence, the court has some sixty documents which the court has reviewed very thoroughly, I might add. It is the court's view that no parol evidence could conceivably begin to approach what counsel are alleging before the court. Under those circumstances, the court will not permit the calling of witnesses in this motion.

I will be glad to hear any further arguments from either side in this case. I would ask counsel not to repeat the previous arguments they have already made to the court.

The court concluded the hearing by denying the motion, as well as all other motions that appellants had filed. The court specifically found that no contract had been formed between the parties and that appellants could have indicated their intent to settle by signing MDIF's letter of December 2, 1986, which they did not sign. This appeal followed.

## ISSUES

I. Whether the trial court committed reversible error by denying appellants a plenary hearing on their motion to enforce settlement.

II. Whether the trial court erred in denying appellants' motion to recuse all judges of the Eighth Judicial Circuit from the hearing on the motion to enforce settlement.

## I.

## THE HEARING ISSUE

In *Litzenberg v. Litzenberg,* 57 Md.App. 303, 469 A.2d 1279, *cert. denied,* 300 Md. 89, 475 A.2d 1201 (1984), *appeal after remand,* 307 Md. 408, 514 A.2d 476 (1986), a case also involving a motion to enforce a settlement agreement, we said:

It is now well established that the trial court has power to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it. Quite obviously, so simple and speedy a remedy serves well the policy favoring compromise, which in turn has made a major contribution to its popularity.

Yet it is apparent that the summary procedure for enforcement of unperformed settlement contracts is not a panacea for the myriad types of problems that may arise. The summary procedure is admirably suited to situations where, for example, a binding settlement bargain is con-

ceded or shown, and the excuse for nonperformance is comparatively unsubstantial. On the other hand, it is ill-suited to situations presenting complex factual issues related either to the formation or the consummation of the contract, which only testimonial exploration in a more plenary proceeding is apt to satisfactorily resolve. We commend the summary practice for use in connection with problems capable of precise resolution without attendant hazard to the interests of the parties. At the same time, it is evident that beyond that point the convenience of the summary procedure must yield to the exigences of safeguarding all legally protected rights that are involved.

[S]ummary enforcement of settlement agreements is most appropriate 'where there is no factual dispute and no legal defense to enforcement.' (citations omitted).

57 Md.App. at 311–12, 469 A.2d 1279 (quoting *Autera v. Robinson*, 419 F.2d 1197, 1200 & n. 11 (D.C.Cir.1969).

In *Litzenberg*, as in this case, the appellant alleged that an executory contract had been orally formed with the appellee as the result of a court hearing. *See* 307 Md. at 418–19, 514 A.2d 476. The agreement there, as here, contained provisions concerning real property. The appellant asserted that appellee's in-court admission that she had authorized her attorney to accept a settlement satisfied the writing requirement for the agreement under the Statute of Frauds.[3] *Id.* There, as here, the parties never executed a written agreement, although the oral settlement negotiations were made expressly subject to written documentation. *Id.* at 419, 421, 514 A.2d 476. This court specifically held in *Litzenberg* that the factual dispute over the appel-

---

3. **§ 5–104. Executory contracts.**
   No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him.
MD. REAL PROPERTY CODE ANNOTATED (1988 Repl.Vol.)

lants' attorneys' authority to settle was too complex to have been summarily dismissed by the trial court. *See* 57 Md. App. at 314–15, 469 A.2d 1279. We concluded by remanding the case to the trial court for further proceedings consistent with our decision. *Id.* at 315–17, 469 A.2d 1279. Thus, the resolution of the first issue in the instant case also hinges in part upon whether there was a factual dispute of such magnitude as to require a full evidentiary hearing. We will also address the impact of the Statute of Frauds on this issue.

### A.

#### *The Nature of the Dispute*

Appellants contend that the parties agreed to certain terms of the proposed agreement at the January 2nd settlement conference, and that these terms could have been enforced despite the aleatory status of other terms. This argument in effect amounts to a claim that the "agreed" upon provisions were severable from the balance of the agreement. We disagree.

Maryland courts have long held that:

whether a contract was entire or divisible, depends on its terms 'and in order to arrive at a correct construction due regard must be had to the intention of the contracting parties as revealed by the language which they have employed and the subject matter to which it has reference.'

*Rothman v. National Mutual Insurance Co.,* 197 Md. 173, 180, 78 A.2d 468 (1951) (quoting *Olmstead v. Bach,* 78 Md. 132, 144, 27 A. 501 (1893)). The intention of both MDIF and appellants at the time of the January 2 conference was to supplement the basic terms which they had discussed with additional terms and to incorporate all of them into a written agreement. Appellants assert that the basic terms of the agreement are set forth in their proffer of the proposed testimony of their tax attorney, Frederick Steinman. In their motion to enforce settlement, however, appel-

lants argued that the basic terms of agreement were stated in MDIF's letter of December 22, 1986, which includes several key provisions favorable to MDIF that are not mentioned in their proffer on behalf of Steinman. For example, while the letter clearly states that no money was to be set aside for the payment of legal fees, no mention of this is made in any of appellants' proffers of testimony. In fact, they expressly rejected this provision by letter on March 5, 1987. Another proposal of the December 22 letter not mentioned in appellants' proffers is that appellants would not go into a Chapter 11 bankruptcy reorganization until 90 days after MDIF had received the assets to be transferred, and that for a one year period after this transfer, appellants would file for Chapter 11 only for compelling reasons. These provisions were clearly important to MDIF, although not settled at the January 2 conference.

Even the basic terms that were allegedly settled became the subject of heated dispute when the parties attempted to particularize them. For example, although both sides understood that MDIF was to monitor continuously appellants' financial affairs, MDIF wanted this right unconditionally for a period of three years, while appellants were willing to grant this right only upon notice to them and only for one year. MDIF also wanted appellants to agree neither to receive nor disburse any cash amount over $500.00 in any transaction for three years after the date of the agreement. The importance of these disputes is evident in the number of drafts of paragraph 9 that the parties exchanged.

There was a definite relationship between some of the basic terms agreed upon and those left to be settled. For example, appellants had agreed to transfer all of their assets except for those stated in the December 22 letter. It was therefore crucial that MDIF be able to monitor continuously appellants' financial affairs to ensure that appellants not deplete the assets to be transferred. This right was also crucial to ensure that appellants would not file for

bankruptcy and transfer these assets to any creditors or to anyone else before MDIF received them. To enforce only the "agreed" terms and leave open the unsettled terms, would be to grant appellants their bargain while potentially leaving MDIF out in the cold. Under these circumstances it simply cannot be argued that the trial court could have enforced the terms mentioned in appellants' proffers separately from various crucial terms yet to be decided. As MDIF argues, "this is not a case where at the conclusion of the January 2 conference 'there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to.'" *See R.G. Group, Inc. v. Horn & Hardhart Co.,* 751 F.2d 69, 76 (2nd Cir.1984). There is no genuine factual dispute here over whether the parties reached agreement. The only dispute in this case is the legal one of whether despite the parties' disagreement through practically every step of the negotiation process both before and after the January 2 conference, there could have been a valid and binding oral agreement. Our answer is an emphatic no, which leads us to a second consideration, the Statute of Frauds.

### B.

### *The Statute of Frauds*

■ The clear import of the disposition in *Litzenberg* is that even if there was evidence that the parties reached an oral agreement on January 2, 1987, as to a property settlement, the agreement would be subject to disavowal because it contemplated the execution of a formal written document. *See* 307 Md. at 421, 514 A.2d 476; *Cambridge, Inc. v. Goodyear Tire & Rubber Co.,* 471 F.Supp. 1309, 1314 (D.Md.1979). As we previously noted, the Statute of Frauds governs the requirements for contracts concerning the sale or disposition of land or of any interest therein. Several provisions of the proposed agreement disputed here concerned the disposition of appellants' interests in realty. Under § 5–104 and *Litzenberg,* the agreement should have been in writing and signed, because it concerned land and

because it contemplated the execution of formal, written documentation. Accordingly, we reject appellants' argument that the oral testimony exception to the statute of frauds applies in this case.[4] We find moreover, that all of appellants' actions and correspondence following the January 2 conference were inconsistent with any claim that a settlement was reached at that time. Unlike *Litzenberg*, this case involves no genuine dispute of material fact. We find no error in the proceedings conducted by the trial court to resolve the motion to enforce a settlement.

## II.

## THE MOTION TO RECUSE

■ It is well settled that a trial judge has broad discretion in deciding whether to recuse himself, and a successful motion must be supported by an affirmative showing of bias or prejudice. *Nash v. State*, 69 Md.App. 681, 686, 519 A.2d 769 (1987). This discretion is individual with each judge, and not a right that one judge has over another. Consequently, Judge Angeletti had no power to recuse all judges of the Eighth Judicial Circuit. As for whether Judge Angeletti should have recused himself, there are very specific rules for recusal.[5] In this case, as in *Nash*, there

---

4. Appellants advance this argument in their reply brief, citing *Freidman v. Clark*, 252 Md. 26, 32–3, 248 A.2d 867 (1968); *Janowitz v. Slagle*, 250 Md. 140, 145, 242 A.2d 123 (1968); *Pollin v. Perkins*, 223 Md. 532, 539, 165 A.2d 908 (1960); *Sealock v. Hackley*, 186 Md. 49, 52–3, 45 A.2d 744 (1946); and *Trossbach v. Trossbach*, 185 Md. 47, 55–6, 42 A.2d 905 (1945).

5. **Rule 1231**
   C. RECUSAL.
   (1) A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
   (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
   (b) the judge served as lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during

was no affirmative showing of bias or prejudice. *See id.* The sole fact that Judge Angeletti sits in the same judicial circuit as Judge Kaplan does not meet any standard for proving bias, and its potential relevance was nullified by the

---

such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse or minor child of the judge residing in the judge's household, has a significant financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) the judge, the spouse of the judge, a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or is known by the judge to be an officer, director, or trustee of a party;

(ii) is acting as lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) A judge should keep informed about his or her personal and fiduciary financial interests, and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household.

(3) For the purposes of this section:

(a) the degree of relationship is calculated according to the civil law system;

(b) "fiduciary" includes such relationships as personal representative, executor, administrator, trustee, custodian, attorney in fact by power of attorney, and guardian;

(c) "financial interest" means ownership of a legal or equitable interest, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i) ownership in a mutual or common investment fund that hold securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) the proprietary interest of a policy holder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

((1988) Repl.Vol.)

trial court's determination that Judge Kaplan would not be called as a fact witness in this case. We find no grounds for the circuit court to grant appellants' motion to recuse, and therefore no abuse of discretion.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.