828 A.2d 268

**Karen A. VOGEL**

v.

**T. Joseph TOUHEY.**

No. 01435, Sept. Term, 2002.

Court of Special Appeals of Maryland.

July 2, 2003.

Christpoher G. Hoge (Crowley, Hoge 7 Fein, P.C., on brief), Washington, DC, for appellant.

Kathleen M. Bustraan (P. Christian Dorsey, Lord & Ship, P.A., on brief), Baltimore, for appellee.

Argued before HOLLANDER, EYLER, DEBORAH SWEET, and BARBERA, JJ.

## HOLLANDER, J.

This legal malpractice case is rooted in a divorce action involving Karen Vogel, appellant, and her former husband, Harold Alfert, M.D. During the pendency of the divorce case, Vogel believed that Alfert had deceived her in fashioning their property settlement agreement by failing to fully disclose the

couple's marital assets. Accordingly, appellant retained T. Joseph Touhey, Esquire, appellee, to represent her in an effort to uncover the full extent of the marital assets and to renegotiate her property settlement agreement with Dr. Alfert.

Unhappy with appellee's performance, Vogel discharged Touhey. A few days later, Vogel settled her dispute with Dr. Alfert for $50,000, a fraction of the additional sum she had hoped to recover. Thereafter, appellant filed a legal malpractice suit against Touhey in the Circuit Court for Montgomery County, asserting that she had settled her divorce case on unfavorable terms because appellee: 1) failed "to take adequate discovery and investigative efforts to obtain a complete and accurate assessment of the Alferts' marital assets"; 2) fail[ed] "to properly analyze and evaluate the discovery materials ... produced by Dr. Alfert"; 3) "fail[ed] to employ a competent professional, such as an accountant, to help identify and evaluate the marital assets"; and 4) "recommend[ed] a settlement for an inadequate amount without full knowledge and understanding of the marital assets."

Appellee filed a motion to dismiss, claiming that appellant's malpractice suit was barred by the doctrine of judicial estoppel. In support of his motion, appellee submitted the transcript from the hearing in the divorce case, at which appellant represented that her divorce settlement was "fair and equitable." After the malpractice court (Rowan, J.) granted appellee's motion to dismiss, Vogel noted this appeal. She presents us with a single issue:

> Whether Appellant's lawsuit for legal malpractice ought to have been barred, under the doctrine of judicial estoppel, by her prior statement to the Court, in the underlying divorce hearing, that the marital settlement agreement which had been negotiated by Appellee, and about which she now complains in her malpractice action, was "fair and equitable[,]" where Appellant also complained at the same hearing about Appellee's lack of diligence in investigating her then husband's finances, and where she had had an inadequate opportunity, as of the time of the divorce hear-

ing, to fully review financial records supplied by her then husband in discovery.

For the reasons that follow, we shall affirm.

## FACTUAL SUMMARY[1]

Appellant, who is a lawyer, and Dr. Alfert, who is a urologist, were married on January 25, 1988; no children were born to the union. The couple separated on June 6, 1999.

On March 6, 1999, appellant and Dr. Alfert entered into a property settlement agreement (the "Property Agreement"). Appellant, who has worked in the Criminal, Asset Forfeiture and Money Laundering Division of the Justice Department for over seventeen years, was not represented by counsel in connection with the Property Agreement.

The Property Agreement provided for the equal division of the couple's marital assets, valued at about two million dollars under the Property Agreement. According to appellant, she subsequently discovered that Dr. Alfert had failed to disclose "substantial [marital] assets" during the negotiation of the Property Agreement, with the intent of depriving her of her fair share of the parties' assets, and that he had diverted and/or dissipated marital assets. Appellant alleged that the "pile of [marital] assets that should have been divided" amounted to three or four million dollars.

Accordingly, on or about January 18, 2001, appellant retained appellee to represent her in the divorce case, then pending in the Circuit Court for Montgomery County. She sought legal representation because she "believed that [the] 'Property Agreement' executed on March 6, 1999, by her and her then husband was unfair and had been obtained by

---

1. Because of the pre-trial disposition of this case, we shall rely largely on appellant's factual averments. We note, however, that we have not been provided with several of the documents relied on by appellant, such as the complaint in the domestic case, the property agreement in the divorce case, the judgment of absolute divorce, and the retainer agreement in the malpractice case.

fraudulent misrepresentations, due to [the] lack of full financial disclosure by the husband."

During appellant's initial consultation with Touhey, she told him that the marital assets totaled "substantially more" than the two million dollars that had been the subject of the Property Agreement. Appellant asserted that Dr. Alfert failed to divulge various brokerage accounts, bank accounts, and pension funds. Appellant specifically inquired whether appellee "had sufficient time and interest to handle a domestic case that involved thorough investigation and analysis of the parties' complex financial situation." Touhey assured appellant that "he had sufficient time to devote to such a complex case."

In connection with Touhey's representation of appellant, the parties executed a retainer agreement.[2] It provided, in part:

> You [i.e., appellant] seek to contest the validity of a Property Settlement Agreement with your estranged husband entered into [in] 1999. You claim that marital assets were not disclosed or accounted for by him in the preparation of that Agreement which was [prepared] without counsel.
>
> I [i.e., appellee] have discussed with you candidly the prospects for such a claim and litigation. *Obviously, it all depends on the discovery of those assets, and the identity and value of those assets.*

(Emphasis added in the malpractice complaint).

On February 1, 2001, appellee filed an Amended Counter–Complaint for Absolute Divorce in the underlying divorce case, challenging the Property Agreement. It stated, in part:

> [O]n or about March 6, 1999, [appellant and Dr. Alfert] executed a document entitled Property Agreement.... Additionally, despite the fact that this document specifically required both parties to make full financial disclosure of any and all assets, [appellant] has subsequently discovered, that

---

**2.** Because the retainer agreement is not included in the record, we do not know the date of its execution.

[Dr. Alfert] withheld disclosure of substantial marital assets, of which he has unjustly deprived [appellant]. [Dr. Alfert] also failed to bargain in good faith and made material misrepresentations to [appellant].

Later, when Dr. Alfert opposed appellant's motion to postpone a hearing in the divorce case, appellee filed a response on appellant's behalf. It stated:

[Appellant] is challenging the validity of the Property Agreement, based upon [Dr. Alfert's] failure to disclose substantial marital assets at the time the parties executed the Property Agreement. In order for this issue to be resolved, it is quite apparent, that extensive financial documents must be obtained for numerous marital accounts.

In addition, in February 2001, appellee propounded discovery in the divorce case, including interrogatories and a request for production of documents. On or about March 6, 2001, Dr. Alfert responded to the discovery requests. Appellant alleged in the malpractice case that Dr. Alfert's responses were "incomplete and did not reveal critical information concerning marital assets."

According to the malpractice complaint, appellant "reviewed Dr. Alfert's initial responses to the interrogatories and document requests, noted many discrepancies[,] and regularly asked [appellee] questions, both orally and in writing, about specific marital assets." From February 2001 through April 2001, appellant allegedly made numerous written and oral requests to appellee to obtain more specific financial information from her husband.

Further, appellant alleged in the malpractice complaint that, in order for her to obtain the information needed to assess the nature and value of the marital assets, "the requests would have had to be augmented by subpoenas to financial institutions, depositions and analysis by a professional sophisticated in the area of asset identification and evaluation, such as an accountant." Although appellant "repeatedly requested" that appellee "issue subpoenas to financial institutions," the appellee, she averred, failed to do so.

On March 8, 2001, appellee wrote to Dr. Alfert's lawyer, requesting additional financial information from Dr. Alfert. According to Vogel, appellee "eventually received supplemental answers to interrogatories and additional documents which revealed the existence of previously undisclosed marital assets...." Nevertheless, appellant maintained that Touhey failed to "carefully review[ ] or analyze[ ]" the information "in time to have an impact on the ultimate outcome of the [divorce] case." Appellant also asserted that in March 2001, Touhey was too involved in other cases to devote the necessary time to her case. She alleged:

> In or about March of 2001, on information and belief, [appellee] was heavily involved in motions and trial preparation in a high-profile criminal case in Anne Arundel County. From that time on, [appellee] seemed to have little time to spend on [appellant's] case. Most of the work done on the case, by [appellant's] observation, was performed by a young associate ... who seemed well-intentioned but clearly had difficulty understanding the complex financial records which had been produced. [The associate] also seemed to have little idea of how to obtain the necessary additional information which [appellant] was regularly requesting.

According to appellant, Dr. Alfert telephoned her in April 2001, asking why she had failed to respond to the settlement offer that had been communicated by his attorney. Appellant responded that she was never informed of the settlement offer.

In the meantime, by letter of April 9, 2001, appellee wrote to appellant, advising that "it is essential that we pinpoint the specific marital assets which you contend were hidden from you at the time of the 1998[sic] Separation Agreement." Touhey also asked appellant to "provide ... a list of each and every account or asset which you contend was not properly disclosed or divided at the time of separation." By letter of April 16, 2001, appellant provided a list of the various bank and investment accounts about which she had questions. According to appellant, neither appellee nor his associate ever answered her questions.

In a letter of April 25, 2001, appellee provided appellant with copies of Dr. Alfert's supplemental answers to interrogatories, along with a settlement proposal from Dr. Alfert's attorney. The letter of April 25, 2001 stated, in part:

> Enclosed please [find the] April 11, 2001 correspondence from [Dr. Alfert's counsel] which is self-explanatory.[3] Please review the supplemental Answers to Interrogatories and the settlement proposal and contact me to discuss.

Appellant claimed that she did not receive the documents until after a meeting with appellee and his law associate on April 26, 2001. At that meeting, appellee advised appellant that, based on his evaluation of the discovery materials received from Dr. Alfert, he recommended that she settle the divorce litigation for $50,000, i.e., $50,000 in excess of the assets she was to receive pursuant to the 1999 Property Agreement. Vogel authorized appellee to proceed. By facsimile sent on Thursday April 26, 2001, appellee's associate conveyed a $50,000 settlement demand to Dr. Alfert's counsel. The letter stated:

> This is to confirm that [appellant] has authorized me to offer the following settlement which would fully and finally resolve all matters between our clients:
>
> 1. Mr. Alfert would make a payment in the amount of $50,000 to [appellant] as an adjustment of the parties['] marital property. This is a non-negotiable sum and we do not invite counter-offers.
>
> 2. Each party would then keep all assets currently titled in their name and in their possession.
>
> 3. Each party would be responsible for their own attorney's fees.
>
> 4. The parties would proceed to final uncontested divorce based upon a written separation agreement on these terms.

---

**3.** The letter of April 11, 2001, from Dr. Alfert's attorney is not included in the record. Nor does the record reveal the terms of the settlement offer contained in that letter.

Please contact me promptly with your response so that we may avoid further attorney's fees and court filing. Thank you for your cooperation in this matter.

By return facsimile that same day, Dr. Alfert accepted appellant's settlement demand. As an attorney, appellant believed that once Dr. Alfert accepted her demand, a binding contract was created. However, the facsimiles of both appellant and Dr. Alfert made clear that a written settlement agreement was contemplated.

On April 30, 2001, appellant proceeded to appellee's office to retrieve the documents pertinent to her divorce case. At that time, appellant "found a large box" in a storage room, with her name on it, which contained supplemental documents submitted by her husband during discovery. Vogel alleged in the malpractice complaint that, until then, she did not know that Dr. Alfert had produced the documents. According to appellant, the box contained "hundreds of pages of materials," which were "totally disorganized." Moreover, "[t]here was no sign they had ever been reviewed" by appellee. Indeed, she claimed that "it was apparent from their disorganized state that [the documents] had never been carefully reviewed or analyzed by [appellee], his associate, an accountant or anybody else." And, appellant insisted that she lacked "the time, or the financial acumen, to review, organize and digest the contents. . . ."

Following appellant's discovery of the documents, she promptly terminated appellee's representation in the divorce case, notwithstanding the impending hearing scheduled for May 4, 2001. By letter of May 3, 2001, appellee wrote to appellant: "In accordance with your instructions to withdraw as counsel of record in your case in the Montgomery County Circuit Court, we enclose herewith [the] appropriate Motion and your direction to us." Consequently, appellant appeared without an attorney at the hearing on May 4, 2001, which was conducted by a domestic relations master. The following exchange is relevant:

THE COURT:[4] Okay. And, ma'am? Your name?

[APPELLANT]: Karen Alfert, and I'm representing myself *pro se.*

THE COURT: Yes. Now, is that your intention in this proceeding, that you represent yourself?

[APPELLANT]: Yes, sir.

THE COURT: ... And have you discharged your attorney from representation, from representing you?

Have you terminated his services?

[APPELLANT]: Yes, sir.

THE COURT: Okay. One of the things, there is in the file—it was filed on May 1, 2001—a line from you to the Clerk saying "I'm requesting the withdrawal of T. Joseph Toohey [sic], Esq. as counsel for Karen Vogel Alfert in the above referenced matter by fax this date.["]

"I will request Mr. Toohey [sic] to withdraw as my counsel and to file the appropriate documents with the Circuit Court.["]

"Until new counsel is retained, I will represent myself pro se," and that is signed by you, I believe? So this is something you filed with the court?

[APPELLANT]: Yes, Your Honor.

\* \* \*

THE COURT: ... Mr. Toohey [sic] did not file anything with the court now to formally withdraw his appearance.

We have contacted his office this morning. My secretary contacted his office, and we were informed that he is in court in Anne Arundel County or in Annapolis.[5]

[APPELLANT]: I called yesterday and was told that he was out of town.

---

4. In the transcript of the hearing, the master is identified as "The Court."

5. We cannot determine when appellee's motion to withdraw was filed, but it appears that the motion was granted on May 16, 2001.

THE COURT: Or something. Okay. Were you calling him yesterday to see if he was coming here for you today?

[APPELLANT]: Actually, I called several times this week to talk to him, and he hasn't returned my calls.

THE COURT: All right, but is that about him no longer representing you, or to have him represent you, or—

[APPELLANT]: Well, I think mostly to find out where things stand with him.

THE COURT: All right.

[APPELLANT]: Because I had not heard from him.

THE COURT: Well, what is your understanding of where things stand right now?

[APPELLANT]: My understanding is that he must believe he is withdrawn from the case. Otherwise he would be here today.

THE COURT: And is it your understanding and belief that he was withdrawing, too?

[APPELLANT]: Yes.

THE COURT: Okay. All right. Is it your desire to proceed today on your own behalf and represent yourself?

[APPELLANT]: Yes, Your Honor.

THE COURT: Okay. You understand that an attorney could be helpful to you in terms of giving you advice and representing you?

[APPELLANT]: Well, that is why I am here pro se.

THE COURT: Okay. Do you believe that it would be more helpful for you to not have an attorney? Is that what you are saying?

[APPELLANT]: No, Your Honor.

THE COURT: No. Okay.

[APPELLANT]: I'm sorry. What was the question?

THE COURT: I was asking you do you understand that it could be helpful to you to have an attorney to represent you?

[APPELLANT]: I have had legal advice until now.

THE COURT: Okay.

[APPELLANT]: *So I am fully aware of the issues.*

(Emphasis added).

The court proceeded to inquire as to the terms of the settlement reached by appellant and Dr. Alfert on April 26, 2001. The following colloquy is illuminating:

THE COURT: Okay, and have you come to a settlement of all the issues?

[APPELLANT]: I think so.

THE COURT: Okay. Then are the settlements contained in any written documents at this time, or—

[APPELLANT]: *Yes, Your Honor. Counsel for my husband provided me with a supplemental property settlement a little while ago, and I read it, and it looks fine.*

\* \* \*

THE COURT: Okay. What I would do, ma'am, is give you an opportunity to read the agreement—or, I guess you have read it, *but to make sure that you are satisfied with it, and then if you both want to sign it.*

Then what I am going to do is I am just going to ask both parties briefly on the record, I am going to do what is known as voir dire you.

It is just ask you a series of questions just to be satisfied that you both understand the terms, and that it is in fact your agreement and that you understand that you would be bound by the agreement.

*So if you want to take as much time as you need right now to read through it again, and—*

[APPELLANT]: *I don't need any additional time.*

(Emphasis added).

Thereafter, the Alferts were sworn and the master examined them in regard to their settlement. Notably, the master gave appellant an opportunity to contest the terms of the supplemental settlement agreement and to proceed to trial, if she wanted to do so. Moreover, the master referred to appellant's "right to obtain further discovery" and her "right

to make [her] decision." In response, appellant informed the master of her belief that "[t]he discovery documents had not even been reviewed," but stated that she refused to "go back on [her] word" as to the settlement. Appellant answered in the affirmative when the master asked if she was "satisfied with the terms" of the supplemental property agreement. Of significance here, Vogel expressly indicated that the terms of the agreement were "fair and equitable."

The following colloquy is noteworthy:

THE COURT: ... The May 4, 2001 supplemental property settlement agreement, you have had an opportunity to read that?

\* .\* \*

[APPELLANT]: Yes, Your Honor.

THE COURT: Okay. And up until recently you were represented by counsel in connection with this matter?

[APPELLANT]: Yes, Your honor.

THE COURT: Okay, and *did you have an opportunity to discuss the facts and circumstances with your attorney and have sufficient time to meet with him so that he could give you proper legal advice concerning your rights and responsibilities?*

[APPELLANT]: *Well, that is why I terminated his services.*

THE COURT: Okay, because he wasn't accessible?

[APPELLANT]: *He wasn't accessible. The analysis of the accounts was incomplete. It was incorrect. The discovery documents had not even been reviewed.*

THE COURT: *And had you reviewed them yourself?*

[APPELLANT]: *No. I picked them up Monday morning.*

THE COURT: Okay.

[APPELLANT]: And that is when I terminated their services.

THE COURT: All right, and have you—what is your educational background?

[APPELLANT]: Well, my highest level is a J.D., and I have worked at the Department of Justice for about 17 years. I work in the Criminal Division, Asset Forfeiture and Money Laundering.

THE COURT: Okay. Do you have any remaining questions that you would have concerning the agreement that you would like to raise in open court?

*Do you have any questions at all about the agreements or about your rights or responsibilities or any questions at all about the supplemental property settlement agreement property agreement [sic]?*

[APPELLANT]: *I don't have any questions. I could state what I would have been able to show if discovery had been completed as represented, but that wasn't done, and I agreed to the proposal last Thursday [i.e., April 26, 2001], prior to the discovery of the box of unreviewed records in appellee's office, and I will stick with my word.*

THE COURT: *All right. So you have considered your right to obtain further discovery and your right to make your decision?*

[APPELLANT]: *Well, I don't think in good faith that I can renege on accepting the agreement as presented.*

THE COURT: All right. All right. *Well, you understand that if you didn't come to an agreement that this matter could be set for a contested trial, and then the Court would decide any disputed issues or property issues or property issues [sic], or any issues that are open?*

[APPELLANT]: *I realize that, but I'm not going to go back on my word.*

THE COURT: All right. *And then do you understand, though, that by making an agreement, you are asking that there not be a trial date, and that the terms of this agreement become binding on you and part of a court order?*

[APPELLANT]: *Yes, Your Honor.*

THE COURT: Okay, *and do you believe, then, that the terms of the agreement are fair and equitable?* Are you satisfied with the terms of this agreement?

[APPELLANT]: *They are fair and equitable.*

* * *

THE COURT: *So you have signed both documents as a voluntary act on your part?*

[APPELLANT]: *Yes, Your Honor.*

(Emphasis added).

Thereafter, the master said: "[T]he Court will certainly accept this agreement, and I believe that it was entered into freely and voluntarily by both parties." The master also stated:

[A]nd [Vogel] has also testified that she believes it is fair and equitable, and that she has chosen to proceed without counsel, and I believe that she has the education and experience, and certainly the competence to make that decision and to do so, and so now we will be proceeding now with the divorce hearing.

The master then proceeded with the uncontested divorce hearing. At the close of the hearing, the master indicated that he would recommend a judgment of absolute divorce. According to the transcript, the parties then submitted a waiver of exceptions, in order to expedite the issuance of the divorce decree.[6]

About ten months later, on March 14, 2002, appellant, through counsel, filed a malpractice action against Touhey. As we noted, appellee moved to dismiss, claiming that the suit was barred by the doctrine of judicial estoppel. He asserted, in part:

In [appellant's] papers, and in her testimony of May 4, 200[1], she makes clear that although she was dissatisfied with [appellee], she was satisfied that the settlement agreement distributing the marital property was "fair and equitable." Under the principles of judicial estoppel, [appellant] is

---

**6.** Because we were not provided with a copy of the judgment of absolute divorce, we cannot identify the judge who signed the decree, the terms, or the date of the judgment.

precluded from now asserting that the amount of the settlement of the division of the marital property was inadequate.

In his memorandum in support of the motion, appellee argued: "Judicial estoppel precludes a litigant from taking a position 'which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action.'" Further, appellee contended:

> Where, as in the case at hand, a party (who happens to be an attorney) represents to a court that a settlement agreement is "fair and equitable," that same party should be precluded from later complaining that the same settlement agreement is inadequate. This is particularly so in this case where the [appellant] had discharged [appellee] because of the allegedly poor investigation that he conducted into her husband's assets and disclosure of those assets and where she had taken custody of the financial documents she claims [appellee] failed to review *before* she told the Court that the settlement agreement was "fair and equitable."

> \* \* \*

> ... In complete contradiction to her earlier statements to the Court, however, [appellant] now claims that the marital property settlement is inadequate and she attempts to hold [appellee] responsible for what she calls an inadequate settlement. [Appellant] cannot have it both ways. She is presenting contrary positions to different Courts, and she should be estopped from making a legal malpractice claim under these circumstances.

(Underlining in original).

Appellant countered: "While [appellant] may have been upset that [appellee] had been less than diligent in investigating Dr. Alfert's finances, she had no reason to believe at the time that the new agreement was fundamentally unfair." Further, relying on cases from in and beyond Maryland, appellant argued that "a client's agreement to settle a case does not bar a subsequent suit by the client against her lawyer for negligence in recommending the settlement." According

to appellant, she is not judicially estopped from raising the claim, because her conduct was not "heinous," "fast and loose," or tantamount to "blatant misrepresentations." She asserted:

Nor has [appellant] herein played "fast and loose" with the Court. On the contrary, her behavior toward the Court has been impeccable. She did not try to reneg [sic] on an agreement she knew she had been bound to by her lawyer. She did the honorable thing and accepted it. Accordingly, she should not be penalized by dismissal of her malpractice claim.

In support of her opposition to Touhey's motion to dismiss, appellant also submitted an affidavit. She averred, in part:

6. That at the April 26 [, 2001] meeting [between appellant and appellee], Mr. Touhey explained to me that he had evaluated materials received from Dr. Alfert and that he believed the best I could do was receive $50,000 more than I was to get under the earlier, *pro se* Property Agreement. He stated that if I didn't accept such an amount, I might do worse at trial. One of the reasons given to me by Mr. Touhey in favor of such a settlement was that the stock market had declined since the date of the *pro se* agreement. During the discussion, Mr. Touhey gave me the impression that he had studied and analyzed the supplemental discovery materials which had been provided by Dr. Alfert earlier in April. The next day, April 27, we were scheduled to go to a mandatory pretrial settlement conference, we might not get such a good settlement. *Based upon this discussion and his recommendations, I authorized Mr. Touhey to communicate to my husband's attorney a demand for $50,000 'as an adjustment of the parties['] marital property.*

(Emphasis added).

At the hearing in the malpractice case on July 30, 2002, the court focused on appellant's representation that the settlement agreement was fair and equitable, and informed appellant that it was "inclined to adopt [appellee's] argument...." The following exchange is pertinent:

THE COURT: Unless you can persuade me otherwise. I mean, I recognize everything that you said, but your client, in effect, stood up in court and said, you know, this is fair and equitable.

[COUNSEL FOR APPELLANT]: Your Honor, I think that the Court has to take into consideration the circumstances around which she said that, and that's what I've tried to elucidate in my papers and in her affidavit.

\* \* \*

THE COURT: [S]he gets upset with [appellee], whether its justified or not, I don't know, and, in effect says, you're gone. I don't want you anymore. And I want to see all my papers.

[COUNSEL FOR APPELLANT]: More than in effect, she fires him.

THE COURT: Right. I want to see all my papers. So she gets the papers and says—I take it from what you've said in your papers, and what she has said—she gets the papers and it becomes apparent to her that Touhey hadn't reviewed these.

[COUNSEL FOR APPELLANT]: Correct.

THE COURT: And once again she's getting shafted.

[COUNSEL FOR APPELLANT]: Yes.

THE COURT: And, as she says, "I didn't do any thorough analytical analysis of it, but"—I mean, *she's already fired him because she didn't think he did a good job, gets papers now that buttress her argument that he didn't do a good job, and then marches into court four days later and said, Hey Judge, everything is okay. It's a fair and equitable settlement.*

(Emphasis added).

Appellant's malpractice lawyer observed that appellant "felt [at] the [divorce] hearing that [she] had to, in effect, carry through on [her] agreement," which she made with Dr. Alfert *before* she discovered that Touhey had failed to review the financial records. Moreover, because appellant relied on

Touhey's advice when she accepted the additional $50,000 in settlement, appellant's attorney maintained that she "had no chance to do any kind of exhaustive, comprehensive analytical processing of what was in the box of documents." Vogel's attorney emphasized that appellant hired Touhey to establish that Dr. Alfert "hoodwinked" her with respect to the original Property Agreement and, at the divorce hearing in May 2001, appellant disclosed that she was dissatisfied with appellee's performance. Appellant's counsel insisted that a party's prior settlement in an underlying case does not preclude a subsequent legal malpractice action. Because appellant had acted mistakenly but in good faith, she insisted that judicial estoppel did not preclude her from pursuing the malpractice case.

The court disagreed, ruling that appellant's malpractice claim was barred by judicial estoppel. It said:

> The Court agrees with the arguments of the defendant Touhey that, in fact, judicial estoppel is present in this case. And, accordingly, the Court will order that [appellant's] complaint is dismissed with prejudice.
>
> * * *
>
> [I]t just seems to me that under the circumstances, that when a person who is particularly knowledgeable as a lawyer stands up, after being dissatisfied with her own lawyer and says, after having the documents in her hands that she later is going to use as the basis of a malpractice action, says that everything is fair and equitable, I don't see how this can proceed in violation of the judicial estoppel rule.
>
> For those reasons the Court is going to grant the motion to dismiss, which really, in effect, because it brings in outside items is a motion for summary judgment.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Vogel argues that the court erred in dismissing her case based on the doctrine of judicial estoppel. She asserts that

the doctrine is designed to protect courts from "egregious conduct" perpetrated by a litigant. Vogel contends that "application of the doctrine ... requires an element of wrongful misconduct that is conspicuously absent in the instant proceeding." Because she had no "intent to deceive whatsoever," and lacked full knowledge of important facts, appellant maintains that the doctrine of judicial estoppel is not applicable.

Appellant concedes, as she must, that at the time of the divorce settlement "she was generally aware of [appellee's] lack of care in discovering her husband's assets." But, she asserts that she "learn[ed] subsequently, on careful review of the papers with her accountant, that the agreement was grossly unfair[.]" Vogel insists that she acted in good faith, and claims her conduct was the result of appellee's negligence. In her view, "an innocent inconsistent statement, where the declarant is not in possession of all the relevant facts, is insufficient to support the application of the [judicial estoppel] doctrine."

In this regard, Vogel emphasizes that she obtained Dr. Alfert's documents from appellee *after* she reached a binding settlement agreement with Dr. Alfert, pursuant to appellee's recommendation. Although Vogel had possession of Dr. Alfert's documents by the time of the court hearing on May 4, 2001, she contends that she lacked the financial acumen to analyze the records, and had neither the right nor the obligation to repudiate the prior settlement agreement with Dr. Alfert. Thus, appellant asserts: "Rather than be castigated, Appellant should be credited for doing the right thing under difficult circumstances."

Additionally, claiming "a client's agreement to settle a case does not bar a subsequent [malpractice] suit by the client against her lawyer for negligence in recommending the settlement," appellant urges us to reverse. According to appellant, the doctrine of judicial estoppel does not apply here, because "she clearly did not have full knowledge of what was in her husband's financial documents when she announced that the divorce settlement was 'fair and equitable.'"

Appellee vigorously disputes appellant's contention that, in order for judicial estoppel to apply, he must show that she acted with an intent to deceive. According to appellee, "the doctrine of judicial estoppel has been applied by the Court of Appeals in circumstances where a party's inconsistent position was not attributable to any willful or intentional misrepresentation." Therefore, appellee seeks to bind Vogel to her assertion on May 4, 2001, when she announced that she was "fully aware of the issues" and that the settlement was "fair and equitable." Appellee contends: "Without question [appellant] was chargeable with knowledge of the facts before she told the court that the property settlement agreement was 'fair and equitable'. . . ." Thus, he urges the Court to preclude appellant "from taking an inconsistent position by asserting that the settlement to which she agreed was not 'fair and equitable.'" He reasons:

[Appellant] was not compelled to agree in open court that the settlement agreement in the underlying matter was "fair and equitable. . . ." She had the option, if she so chose, to say that the settlement was not appropriate and/or to request more time to review the financial records and obtain new counsel. She elected to do neither.

Further, appellee distinguishes the malpractice cases cited by appellant, noting that in those cases "the disappointed legal malpractice plaintiffs all discovered their attorneys' negligence after they finalized their settlements." Characterizing appellant as a "sophisticated party" with "legal training," Touhey maintains that she "had sufficient time to review the financial records and reach an independent judgment with respect to them."

## II.

Appellee's motion was styled as a motion to dismiss, but it was replete with references to the transcript of the hearing of May 4, 2001, which was attached as an exhibit to the motion. Additionally, in her opposition, appellant referred to numerous exhibits that were appended to her opposition. Because the

court considered those "outside items," the parties and the court below recognized that appellee's motion to dismiss was transformed to a motion for summary judgment, pursuant to Maryland Rule 2–322(c).[7] Accordingly, we turn to consider the standard of review applicable to a summary judgment ruling.

Maryland Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *see Todd v. Mass Transit Admin.,* 373 Md. 149, 154–55, 816 A.2d 930 (2003); *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church,* 370 Md. 152, 168 n. 15, 803 A.2d 548 (2002); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *see also Cooper v. Berkshire Life Ins. Co.,* 148 Md.App. 41, 56, 810 A.2d 1045 (2002), *cert. denied,* 373 Md. 407, 818 A.2d 1105 (2003).

A *material* fact is one that will alter the outcome of the case, depending upon how the factfinder resolves the dispute. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Miller v. Fairchild Indus., Inc.,* 97 Md.App. 324, 340, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). Neither general allegations nor mere formal denials are suffi-

---

7. The rule provides, in part:

 If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501....

 *See* Md. Rule 2–322(c) (2003); *see also Pope v. Board of Sch. Comm'rs,* 106 Md.App. 578, 590, 665 A.2d 713 (1995), *cert. denied,* 342 Md. 116, 673 A.2d 707 (1996); *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md. App. 772, 783, 614 A.2d 1021 (1992) ("If the court does not exclude the outside matters, however, the rule [Rule 2–322] mandates that 'the motion *shall* be treated as one for summary judgment....' "), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993) (citation omitted) (emphasis in *Hrehorovich* ).

cient to establish a material factual dispute. *See King,* 303 Md. at 112, 492 A.2d 608; *see also Herrington v. Red Run Corp.,* 148 Md.App. 357, 361, 811 A.2d 894 (2002).

Once the movant demonstrates the absence of a dispute concerning material facts, the burden shifts to the non-moving party to identify "with particularity the material facts that are disputed." Md. Rule 2-501(b). "[T]he mere existence of a scintilla of evidence . . . is insufficient to preclude the grant of summary judgment. . . ." *Beatty,* 330 Md. at 738, 625 A.2d 1005. Rather, the party opposing summary judgment must present admissible evidence that is sufficiently detailed and precise to illuminate its nature. *Beatty,* 330 Md. at 737–38, 625 A.2d 1005. Speculation concerning the existence of unproduced evidence will not defeat the motion. *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 262, 634 A.2d 1330 (1994). Further, if the motion is "supported by an affidavit or other statement under oath, an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath." Maryland Rule 2-501(b).

In resolving a motion for summary judgment, the trial court may not determine the credibility of witnesses. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 326, 389 A.2d 887 (1978); *Cooper,* 148 Md.App. at 56, 810 A.2d 1045. Rather, the court must resolve against the moving party all disputes of fact, along with all inferences that can be drawn from the evidence. *Todd,* 373 Md. at 155, 816 A.2d 930; *Frederick Road Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 94, 756 A.2d 963 (2000).

If an appellate court is satisfied that no material facts are in dispute, it must determine whether the trial court was legally correct. *Todd,* 373 Md. at 155, 816 A.2d 930; *Beyer v. Morgan State Univ.,* 369 Md. 335, 360, 800 A.2d 707 (2002); *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996); *Goldstein v. 91st St. Joint Venture,* 131 Md.App. 546, 560, 750 A.2d 602, *cert. denied,* 360 Md. 273, 757

A.2d 809 (2000). In our *de novo* review, *Todd,* 373 Md. at 154, 816 A.2d 930; *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148 (2002), we evaluate "the 'same material from the record and decide the same issues of law as the trial court.'" *Cooper,* 148 Md.App. at 56, 810 A.2d 1045 (citation omitted); *see Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998).

"Appellate courts ordinarily review the grant of summary judgment 'only on the grounds relied upon by the trial court.'" *Richman v. FWB Bank,* 122 Md.App. 110, 147, 712 A.2d 41 (1998)(quoting *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995)), *aff'd,* 354 Md. 472, 731 A.2d 916 (1999); *see Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co., Inc.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996). But, " 'if the alternative ground is one upon which the circuit court would have had no discretion to deny summary judgment, summary judgment may be granted for a reason not relied on by the trial court.'" *Ragin v. Porter Hayden Co.,* 133 Md.App. 116, 134, 754 A.2d 503, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000) (citation omitted).

In the case *sub judice,* appellee does not dispute any of the facts presented by appellant in her complaint or in her brief to this Court. His sole argument is a legal one; taking the facts asserted by appellant, Touhey contends that appellant's legal malpractice claim is barred under the doctrine of judicial estoppel. Accordingly, we turn to consider whether the trial court was legally correct. *Beyer,* 369 Md. at 360, 800 A.2d 707; *Goodwich v. Sinai Hosp.,* 343 Md. 185, 204, 680 A.2d 1067 (1996).

### III.

We begin our analysis with a review of the doctrine of judicial estoppel. *Eagan v. Calhoun,* 347 Md. 72, 698 A.2d 1097 (1997), provides guidance. As the Court of Appeals said in *Eagan,* "Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the

English Court of Exchequer ... that '[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another.'" *Id.* at 88, 698 A.2d 1097 (citation omitted). Similarly, this Court explained in *Gordon v. Posner*, 142 Md.App. 399, 424, 790 A.2d 675, *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002), that "[j]udicial estoppel, also known as the 'doctrine against inconsistent positions,' and 'estoppel by admission,' prevents 'a party who successfully pursued a position in a prior legal proceeding from asserting a contrary position in a later proceeding.'" (quoting *Roane v. Washington Co. Hosp.*, 137 Md.App. 582, 592, 769 A.2d 263, *cert. denied*, 364 Md. 463, 773 A.2d 514 (2001)); *see also Kobrine v. Metzger*, 151 Md. App. 260, 273, 824 A.2d 1031 (2003) (stating that the doctrine of judicial estoppel "is only applicable in cases where the party has successfully pursued one theory, but then asserts a second, contrary theory, in another action."); *Mathews v. Underwood–Gary*, 133 Md.App. 570, 579, 758 A.2d 1019 (2000), *aff'd.*, 362 Md. 187, 763 A.2d 734 (2001).

Elucidating the rationale that undergirds the doctrine of judicial estoppel, this Court said in *Gordon:*

> There are two important reasons for estoppel. First, the doctrine of judicial estoppel "rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise." Judicial estoppel ensures "the 'integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]'"

142 Md.App. at 425, 790 A.2d 675 (alteration in original; citations omitted).

■ Nevertheless, a party is not always foreclosed from asserting a position that is inconsistent with one previously adopted. Judicial estoppel is inapplicable unless the party "'"had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action."'" *Gordon*, 142 Md.App. at 426, 790 A.2d 675 (citations omitted); *see Stone v. Stone*, 230 Md. 248, 253, 186 A.2d 590 (1962); *United Book*

*Press v. Maryland Composition Co., Inc.,* 141 Md.App. 460, 470, 786 A.2d 1 (2001); *Roane,* 137 Md.App. at 592, 769 A.2d 263. In *WinMark Ltd. P'ship v. Miles & Stockbridge,* 345 Md. 614, 693 A.2d 824 (1997), the Court said:

> "It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose."

*Id.* at 620, 693 A.2d 824 (citation omitted).

To be sure, "[t]he circumstance under which judicial estoppel may appropriately be involved are probably not reducible to any general formulation of principle." *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166 (4th Cir.1982); *see Lowery v. Stovall,* 92 F.3d 219, 223 (4th Cir.1996). But, the Supreme Court has articulated several factors relevant to the judicial estoppel analysis. In *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), it said:

> [S]everal factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

(Internal citations omitted). The Supreme Court cautioned, however, that it was "not establish[ing] inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id.* at 751, 121 S.Ct. 1808. To the con-

trary, it observed that "[a]ddditional considerations may inform the doctrine's application in specific factual contexts." *Id.*

 At the divorce hearing, appellant said that she was "fully aware of the issues" and that the supplemental settlement was "fair and equitable." Based upon appellant's representations to the divorce court, she was successful in persuading the master to accept the supplemental settlement and to recommend the divorce decree, which the circuit court subsequently issued.[8] Later, in the malpractice action, appellant mounted a collateral attack on the divorce settlement. She insisted that she lacked full knowledge of material facts and claimed that, because of appellee's negligence, her supplemental divorce settlement was grossly unfair and inequitable. Thus, Vogel's representations to the divorce court—that she was cognizant of the issues and satisfied with the property settlement—were clearly inconsistent with her position in the malpractice case. Nevertheless, she urges us to conclude that her prior representations in the domestic case were not made with the requisite intent to mislead.[9]

In support of Vogel's claim that application of the judicial estoppel doctrine requires intentional misconduct, appellant

---

**8.** We recognize that "a master is not a judicial officer and is not vested with judicial powers...." *Harryman v. State,* 359 Md. 492, 505, 754 A.2d 1018 (2000); *see O'Brien v. O'Brien,* 367 Md. 547, 554, 790 A.2d 1 (2002); Md. Rule 9–208 (2003). But, a master is authorized to take testimony, and a master's findings of fact "are to be treated as *prima facie* correct and are not to be disturbed by the court unless found to be clearly erroneous...." *O'Brien,* 367 Md. at 554, 790 A.2d 1. The master is also authorized to make recommendations, which must be reviewed by the court. *Id.* at 554–55, 790 A.2d 1. When, as here, "no exceptions are ... filed, the court may proceed to enter an order or judgment." *Id.* at 555, 790 A.2d 1.

**9.** Significantly, appellant has not argued that judicial estoppel is inapplicable on the ground that her representations were made to a master rather than to a judge. Indeed, for purposes of this case, appellant has not drawn any distinction between a domestic master and the circuit court. In her brief, for example, appellant never indicated that the hearing on May 4, 2001, was conducted by a master. Vogel writes: "At a hearing held by the Circuit Court on May 4, 2001, Appellant was *voir dired* by the Court.... [S]he also made several other statements to the Court...."

relies, *inter alia*, on *Wilson v. Stanbury*, 118 Md.App. 209, 702 A.2d 436 (1997). In appellant's view, the *Wilson* decision limits application of judicial estoppel to those situations in which the party making the prior inconsistent statement acted deliberately, with the specific intent to mislead or deceive the court.

In *Wilson*, the appellant alleged that his first lawyer, the appellee, committed legal malpractice by suing the wrong party, Queen, as the sole tortfeasor in connection with an underlying auto tort. *Id.* at 210, 702 A.2d 436. After the statute of limitations had expired, the appellee realized that he had failed to sue the actual tortfeasor, Brumfield. *Id.* The appellee informed the appellant of his error and advised him to obtain new counsel. *Id.* at 211, 702 A.2d 436.

Appellant's new attorney refiled the suit against Queen, knowing he was not liable, after Queen agreed not to raise the bar of limitations. Appellant's new attorney subsequently procured a settlement from Queen's insurance carrier, apparently because the insurer was unaware that Brumfield actually caused the accident. *Id.* at 212, 702 A.2d 436. Then, the same attorney filed a legal malpractice case against appellee on appellant's behalf. *Id.* In finding that appellant's malpractice suit was barred by judicial estoppel, the Court stated that it was "clear that the improper allegations [against Queen] were made intentionally for an improper purpose." *Id.* at 215, 702 A.2d 436. The Court also stated, *id.* at 217, 702 A.2d 436:

> We are especially cognizant ... that the doctrine of judicial estoppel has evolved to protect the courts from just the type of egregious conduct that occurred, on appellant's behalf, during the ... Queen case and the instant case. If we were to hold that the doctrine did not apply under these circumstances, it would be hard to imagine when it would be applicable.

We have not uncovered any Maryland case that has squarely addressed the issue of whether judicial estoppel includes, as a required element, the intent to mislead the court to obtain

an unfair advantage. But, *Pittman v. Atlantic Realty Co.,* 359 Md. 513, 754 A.2d 1030 (2000), is noteworthy. There, in *dicta,* the Court of Appeals recognized the standard articulated by the Fourth Circuit. Quoting *Sedlack v. Braswell Servs. Group, Inc.,* 134 F.3d 219, 224 (4th Cir.1998), the *Pittman* Court said that, in order for judicial estoppel to apply, " 'the party sought to be estopped must intentionally have misled the court to gain unfair advantage.' " *Pittman,* 359 Md. at 529 n. 9, 754 A.2d 1030. But, the *Pittman* Court expressly noted that judicial estoppel was not raised by the appellants. *See also Winmark Limited P'ship v. Miles & Stockbridge,* 109 Md.App. 149, 170–71, 674 A.2d 73 (1996) ("[C]ases outside of the unique context of a debtor's nondisclosure of a claim in bankruptcy support the proposition that the application of judicial estoppel depends on the deliberate manner in which the party assumes two inconsistent positions."), *rev'd on other grounds,* 345 Md. 614, 693 A.2d 824 (1997).

In *Sedlack,* 134 F.3d 219, the Fourth Circuit recognized intent to mislead the court as an element in the judicial estoppel analysis. It said:

Although "courts have had difficulty in formulating a specific test for determining when judicial estoppel should be applied," at least three elements must always be satisfied. First, the party sought to be estopped must assert a position inconsistent with that taken in prior litigation and the position must be one of fact rather than law or legal theory. Second, the prior inconsistent position must have been accepted by the court. And third, the party sought to be estopped must intentionally have misled the court to gain unfair advantage.

*Id.* at 224 (citations omitted). *See John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 29 (4th Cir.1995) ("The 'determinative factor' in the application of judicial estoppel is whether the party who is alleged to be estopped 'intentionally misled the court to gain unfair advantage.' ") (Citation omitted).

Several other federal and state courts have expressly recognized intent as an element in regard to the application of

judicial estoppel. *See, e.g., Thompson v. Continental Airlines,* 18 S.W.3d 701, 703–04 (Tex.App.2000) (recognizing that judicial estoppel "may be applied only when the position of the party to be estopped is clearly inconsistent with its previous one, the court must have accepted the prior position[,] and the party must have acted intentionally, not inadvertently"); *Chandler v. Samford Univ.,* 35 F.Supp.2d 861, 863 (N.D.Ala. 1999) (concluding that the "applicability of the doctrine of judicial estoppel ... requires a determination that ... the inconsistency would allow a party to benefit from deliberate manipulation of the courts"); *O'Neill v. O'Neill,* 551 So.2d 228, 232 (Miss.1989) (noting that judicial estoppel applies "only in those cases where the party against whom the estoppel is sought has knowingly ... asserted a position which was inconsistent with its position in prior judicial proceedings"); *Scarano v. Central R. Co.,* 203 F.2d 510, 513 (3d Cir.1953) (stating that judicial estoppel bars use of "intentional self-contradiction ... as a means of obtaining unfair advantage").

While the Court of Appeals in *Eagan, supra,* 347 Md. 72, 698 A.2d 1097, did not directly address the issue of intent as an element of judicial estoppel, the holding in that case seems consistent with the view that, in order for the doctrine of judicial estoppel to apply, the party sought to be estopped must have asserted an inconsistent position knowingly, intentionally, or deliberately, in order to gain an unfair advantage. In that case, a wrongful death action was initiated on behalf of two minor children who claimed that their father killed their mother. The Court of Appeals considered whether the children's wrongful death action was barred based on the doctrine of parent-child immunity. The Court agreed with this Court, 111 Md.App. 362, 681 A.2d 609 (1996), that the parent-child immunity doctrine does not bar a wrongful death action filed on behalf of a minor child if the parent committed an act of murder or voluntary manslaughter as to the deceased parent. *Eagan,* 347 Md. at 74, 698 A.2d 1097. Moreover, the Court acknowledged that, ordinarily, "it would be a jury question whether" the accused parent intentionally killed the other parent. *Id.* at 86, 698 A.2d 1097. Based on the father's claim

at trial that his wife's death was an accident, this Court remanded for a new trial on that issue. 111 Md.App. at 398–99, 681 A.2d 609. But, the Court of Appeals disagreed with the remand. 347 Md. at 86–87, 698 A.2d 1097.

From its independent review of the record, the Court of Appeals determined that the father was judicially estopped from claiming that he killed his wife accidentally. *Id.* at 88, 698 A.2d 1097. The Court noted that, in the prior criminal action against the father, he "had entered a plea of guilty to manslaughter, which constituted a judicial admission" that he had killed his wife. *Id.* at 87, 698 A.2d 1097. Moreover, the Court acknowledged that, ordinarily, such an admission would not be conclusive and "was subject to rebuttal." *Id.* The Court determined, however, that rebuttal was not an option available to the father in the *Eagan* case. It relied on an exhibit attached to the father's affidavit, submitted by him in connection with his motion for summary judgment in a collateral proceeding pertaining to the guardianship of his children. *Id.* There, the father "took the position," through counsel, that "the death of [his wife] was homicide, homicide was voluntary manslaughter, [and appellee] was the criminal agent...." *Id.* (emphasis omitted).

In advancing his position in the guardianship proceeding, the father sought to benefit from the "slayer's rule," by which he would hold his wife's half interest in the marital home in trust for their children. The father claimed that the wife's half interest in the marital home "devolved to him by reason of [his wife's] death in trust for his children." *Id.* Writing for the Court of Appeals, Judge Wilner said, *id.* at 88, 698 A.2d 1097:

> In the memorandum filed by [the father's] attorney in connection with the guardianship matter, [appellee] acknowledged that his conduct constituted voluntary manslaughter and was therefore intentional. [Appellee] was obviously aware of that memorandum, as he attached a copy of it to his own affidavit filed in this case. Having thus conceded that the killing of [his wife] was an act of voluntary manslaughter, [appellee] is estopped from taking any

contrary position in this case. At the very least, the force of that estoppel allows the plea of guilty to stand unrebutted and thus to establish that the killing was a voluntary manslaughter. Accordingly, the ... exception [to parent-child immunity] applies as a matter of law....

*New Hampshire v. Maine, supra,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968, is also instructive. That case involved a dispute between Maine and New Hampshire with respect to the boundary "along the inland stretch of the Piscataqua River...." *Id.* at 746, 121 S.Ct. 1808. New Hampshire brought an original action against Maine, "claiming that the Piscataqua River boundary runs along the Maine shore and that the entire river and all of Portsmouth Harbor belong to New Hampshire." *Id.* at 745, 121 S.Ct. 1808. Relying on judicial estoppel, Maine moved to dismiss the case. It argued that the river boundary was "definitively fixed" at "the middle of the river's main channel of navigation," *id.* at 745, 121 S.Ct. 1808, based on a 1740 decree issued by King George II, and a 1977 consent judgment entered by the Supreme Court in connection with litigation between the same states concerning lobster fishing rights and "the 'lateral marine boundary.'" *Id.* at 746, 121 S.Ct. 1808. The Supreme Court agreed and granted Maine's motion. *Id.*

The 1977 consent decree was predicated, in part, on the 1740 decree, which located the river boundary at the "Middle of the River." *Id.* Ruling that New Hampshire was judicially estopped "from asserting—contrary to its position in the 1970's litigation—that the inland Piscataqua River boundary runs along the Maine shore," *id.* at 749, 121 S.Ct. 1808, the Supreme Court said:

> " 'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' "

*Id.* (citation omitted). Further, the Court explained that the "rule [of] judicial estoppel, 'generally prevents a party from

prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Id.* (quoting *Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)).

In concluding that the doctrine of judicial estoppel barred *New Hampshire's* case, the Court reasoned:

> [T]he record of the 1970's dispute makes clear that this Court accepted New Hampshire's agreement with Maine that "Middle of the River" means middle of the main navigable channel, and that New Hampshire benefited from that interpretation.... Although New Hampshire now suggests that it "compromised in Maine's favor" on the definition of "Middle of the River" in the 1970's litigation, . . . that "compromise" enabled New Hampshire to settle the case . . . on terms beneficial to both States. Notably, in their joint motion for entry of the consent decree, New Hampshire and Maine represented to this Court that the proposed judgment was "in the best interest of each State." Relying on that representation, the Court accepted the boundary proposed by the two States.

> \* \* \*

> In short, considerations of equity persuade us that application of judicial estoppel is appropriate in this case. Having convinced this Court to accept one interpretation of "Middle of the River," and having benefited from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense. Were we to accept New Hampshire's latest view, the "risk of inconsistent court determinations," . . . would become a reality. We cannot interpret "Middle of the River" in the 1740 decree to mean two different things along the same boundary line without undermining the integrity of the judicial process.

*Id.* at 752, 755, 121 S.Ct. 1808 (citations omitted).

■ Extrapolating from the cases discussed above, we readily conclude that the doctrine of judicial estoppel bars appellant's legal malpractice claim. We explain.

Appellant hired appellee solely because she believed that Dr. Alfert significantly misrepresented the couple's marital assets at the time of the 1999 Property Agreement. In Vogel's words, she "advised [appellee] that she sought a fair settlement with her husband, based on full financial disclosure by both sides." Moreover, appellant does not dispute that she was aware that the case required "thorough investigation and analysis of the parties' complex financial situation." Although appellant hired appellee for a particular purpose, the uncontroverted facts revealed that, four days prior to the divorce hearing, appellant fired appellee specifically because she believed he had failed to perform; he had not reviewed or analyzed the financial documents produced by Dr. Alfert. Clearly, at the point that appellant discovered the documents produced by Dr. Alfert and fired appellee, appellant knew Touhey was not in a position to recommend a "fair settlement" on her behalf.

To be sure, when Vogel agreed to appellee's recommendation to settle with Dr. Alfert for $50,000, she had not yet discovered that Dr. Alfert had produced the documents in discovery, nor was she aware that appellee had not reviewed them. But, by the time Vogel fired Touhey, and by the time of the divorce hearing a few days later, she had to know what she did not know. She discovered appellee's alleged dereliction prior to the divorce hearing, and knew by the time of the hearing on May 4, 2001, that Touhey had no sound factual basis to support his earlier recommendation to settle with Dr. Alfert for $50,000. Clearly, then, Vogel knew by the time of the divorce hearing that she was not in a position to make an informed decision as to the settlement, because the information she had hired Touhey to obtain had not yet been analyzed. Yet, despite the fact that Vogel knew she had insufficient information as to an appropriate settlement with Dr. Alfert, she represented to the master that she was "fully aware of the issues," and that the settlement was "fair and equitable."

Further, any suggestion by Vogel that she had no choice but to proceed with the settlement is belied by the record. The

master conducted a thorough *voir dire* at the hearing on May 4, 2001, and gave appellant every opportunity to avail herself of a variety of options, including: 1) reneging on the divorce settlement; 2) pursuing further discovery; and 3) proceeding to a trial on the merits. Appellant declined to do so.

Further, appellant had no basis to assume that she was contractually bound to proceed with the oral, supplemental property agreement, reached by the attorneys before she learned of Touhey's alleged dereliction. Significantly, during the divorce hearing Dr. Alfert never demanded that appellant proceed with the settlement agreement, nor did he argue that appellant was legally bound by it. Moreover, both Dr. Alfert and appellant clearly contemplated a written settlement agreement. In her settlement demand, appellant said that the "parties would proceed to final uncontested divorce based upon a written separation agreement on these terms." Similarly, in his responsive facsimile, Dr. Alfert requested that appellee "prepare the written separation agreement." As we recognized in *David v. Warwell*, 86 Md.App. 306, 316, 586 A.2d 775 (1991), when a written settlement agreement is contemplated, there is no settlement until the written agreement is executed. *See also Pearlstein v. Maryland Deposit Ins. Fund*, 78 Md.App. 8, 19, 552 A.2d 51 (1989) (determining that an oral property settlement was "subject to disavowal because it contemplated the execution of a formal written document.").

We acknowledge that, merely because appellant is an attorney, this does not mean that she knew she was not contractually bound to settle the divorce case. Moreover, she may not have had the capability, time, or financial acumen to analyze Dr. Alfert's financial documents. But, there is no indication in the record that the master or Dr. Alfert attempted to force Vogel to choose immediately between a settlement with Dr. Alfert that she did not want or a prompt trial, with or without the benefit of counsel. At the very least, Vogel's status as an attorney for more than seventeen years suggests that she was aware of the right to ask for a postponement to consider her options or to retain new counsel.

Vogel told the divorce court that she refused to "go back on [her] word." Moreover, she did not believe, "in good faith," that she could "renege on accepting the agreement." Yet, the master conducted the *voir dire* to establish that the settlement was a voluntary and knowing settlement; the transcript of the divorce hearing reflects that the agreement was not executed until after appellant indicated in open court that she was "satisfied with the terms." Under these facts, appellant's decision to settle was a matter of her choice, not the product of duress or coercion.

In our view, appellant is bound by her representations in the divorce proceedings. Like the Supreme Court in *New Hampshire v. Maine*, 532 U.S. at 755, 121 S.Ct. 1808, we are persuaded by "considerations of equity . . . that application of judicial estoppel is appropriate in this case." Through her representations, Vogel convinced the master to "accept" her characterization of the property settlement as "fair and equitable," and on that basis to recommend the divorce decree to the circuit court; the divorce decree was subsequently issued by the circuit court. Clearly, she "benefitted" from the court's acceptance of the property agreement: Appellant received $50,000 more than she would have received under the terms of the original 1999 Property Agreement; she was able to settle her divorce case without incurring further expense or time; and, Vogel avoided the risk of an unfavorable result in a contested divorce proceeding. Clearly, Vogel "now urges an inconsistent interpretation to gain an additional advantage at [appellee's] expense." *Id.*

Furthermore, we are satisfied that, from appellant's intentional assertion of an inconsistent position, she would derive an "unfair advantage" if estoppel does not apply. By discharging appellee and then representing to the divorce court that the proposed settlement was fair and equitable, appellant inevitably created the circumstances that culminated in the malpractice claim that Touhey has had to defend. We explain.

Appellant's conduct deprived Touhey or his successor of the opportunity to correct any mistake or malfeasance at a time

when an adjustment of the settlement with Alfert may well have been feasible. Because the divorce trial had not yet occurred, Touhey could have undertaken a review of Dr. Alfert's financial records and attempted to secure a more favorable settlement, if appropriate. If that course of conduct had occurred, obviously there would have been no basis for a malpractice suit. Alternatively, appellant could have retained a new lawyer or a financial consultant to do what she had initially hired appellee to do. Again, if the financial records, upon review, supported Vogel's claims against Dr. Alfert, she may have secured a more favorable settlement from Alfert, or she may have prevailed at a contested divorce hearing. In essence, appellant's decision to settle with Dr. Alfert foreclosed her ability to recover more money from Dr. Alfert and, in turn, it affected appellee's ability to avoid or succeed in the malpractice suit; Vogel's decision to settle made it impossible for her to obtain the result she desired from Dr. Alfert, and it set up the scenario for a malpractice claim against Touhey that might otherwise have been avoided.

 In the context of this case, there is also no merit to appellant's claim that her acceptance of a settlement negotiated by appellee "did not bar her from later complaining about the attorney's performance in recommending the settlement." We explain.

In *Thomas v. Bethea*, 351 Md. 513, 718 A.2d 1187 (1998), the Court of Appeals recognized that a client may be allowed to pursue a legal malpractice claim even when the client accepted a settlement in the underlying action with knowledge of the attorney's negligence. *Id.* at 522, 718 A.2d 1187. Indeed, the Court said that "[t]he principle that a lawyer may be held liable for negligence in the handling of a case that was ultimately settled by the client, whether based on deficiencies in preparation that prejudiced the case and more or less required a settlement or on a negligent evaluation of the client's case, has been accepted by nearly every court that has faced the issue." *Id.* at 527, 718 A.2d 1187. The *Thomas* Court explained, 351 Md. at 522, 718 A.2d 1187:

These kind of cases have tended to fall into two categories, although they sometimes contain features of both. One category involves situations in which the client claims that he or she was given little choice but to settle on disadvantageous terms because the lawyer failed in some other respect to prepare or prosecute the case properly, thereby diminishing the prospect of success if the litigation continued. The gravamen of the action in those situations is not so much that the lawyer negligently recommended a settlement that was unreasonably low, but that what otherwise would be an unreasonably low settlement was essentially forced on the client because of other deficiencies by the lawyer. If the client was aware of those deficiencies prior to settling, the settlement itself, given the circumstances then faced by the client, may not have been unreasonable at all, and, indeed, may have been entirely prudent. The question still is raised of whether, by agreeing to the settlement, the client should be barred from litigating its fairness in a suit against the lawyer, and the answer appears to be "no."

See also *Prande v. Bell,* 105 Md.App. 636, 654, 660 A.2d 1055 (1995) (stating that "[i]t would be patently unfair to allow attorneys who may have committed malpractice in handling a case to turn around and rely on a defense that effectively says that, because the client knowingly settled his or her case, the issue of whether the attorney was negligent was also settled"); *Crowley v. Harvey & Battey, P.A.,* 327 S.C. 68, 488 S.E.2d 334, 335 (1997) (holding that "the fact the client has accepted the benefits of the settlement and judicially sought to enforce its terms are not bars to maintenance of a malpractice claim"); *Lowman v. Karp,* 190 Mich.App. 448, 476 N.W.2d 428, 431 (1991) (concluding that "settlement of the underlying action should not act as an absolute bar to a subsequent legal malpractice action").

*Thomas* is distinguishable from the case *sub judice,* however. Here, appellant was not forced to accept an unreasonably low settlement because of irreparable damage to her case due to appellee's derelictions. Nor did the court put appellant in a

position of having to go to trial imminently if she opted not to settle. And, appellant discovered the appellee's alleged derelictions *before* she consummated her settlement. Therefore, her concerns could have been rectified by a new lawyer or financial consultant.

The case of *Lowman, supra,* 190 Mich.App. 448, 476 N.W.2d 428, is also illuminating. There, the plaintiff/appellant was injured when she was kicked in the head by a horse. She retained the appellee to represent her in a suit against both the owner and boarder of the horse. *Id.* at 429. As the case progressed to trial, the plaintiff informed the appellee that she refused to settle for $20,000, as suggested by a mediation panel and appellee. According to the appellant, the appellee had told her that if she did not settle the case, he would refuse to try the matter. *Id.* The appellant consulted with another attorney and an experienced insurance claims adjuster, both of whom recommended that she refuse to accept the settlement offer and proceed to trial. *Id.* at 431. Nevertheless, the appellant settled the case for $20,000. *Id.* at 429. In doing so, she wrote, beneath her signature: " 'Even though I feel this case is worth more I am accepting on the sole advise [sic] of my attorney.' " *Id.* (alteration in *Lowman* ). Following settlement, the appellant filed a legal malpractice suit against the appellee.

The lower court found that the appellant was estopped from proceeding with the malpractice claim because she had agreed to the settlement. *Id.* In reversing, the Michigan appellate court expressly rejected the appellee's argument that the appellant "should be estopped from suing [the appellee] because she 'knowingly and voluntarily' decided to settle the underlying suit, after having consulted with another attorney and an experienced insurance claims adjuster." *Id.* at 431. That court noted that the appellant became aware of the appellee's improper action "so close to the trial date that it would have been very difficult, if not impossible, . . . to obtain another attorney. Thus, [the appellant] was put in a position where settlement was her only reasonable choice despite her

own reservations about the settlement and despite the advice of others." *Id.*

To be sure, *Thomas* and *Lowman* demonstrate that a party is not necessarily estopped from bringing a malpractice action even after deciding voluntarily to settle an underlying suit. In those cases, however, the parties became aware of the attorneys' negligence after the settlement or so close to the trial date that settlement was a virtual necessity. In contrast, the court here informed appellant that she could pursue additional discovery and then proceed to trial. There is no indication that the court was forcing appellant to trial immediately, or without a lawyer. Therefore, the rationale of cases like *Thomas* and *Lowman* is inapplicable.

As we see it, appellant comes to this court complaining about the divorce settlement, as if the wool had been pulled over her eyes. Although Vogel made a decision that she has come to regret, it is hard to grasp how appellant can blame appellee for her decision to settle. And, if appellant had not settled, she might have secured a more favorable settlement from her spouse. Appellant's voluntary decision to proceed with the supplemental property agreement in her divorce case inescapably leads us to conclude that she knowingly and intentionally represented to the court that the settlement was "fair and equitable." Moreover, she surely would derive an unfair advantage if permitted to renounce her statements to the divorce case.

Accordingly, we are persuaded that, if the doctrine of judicial estoppel does not apply here, appellant would reap the benefit of " 'blowing hot and cold.' " *Eagan, supra,* 347 Md. at 88, 698 A.2d 1097 (citation omitted). The law does not countenance that result. Indeed, if the malpractice court were to find that the settlement agreement in the divorce case is unfair and inequitable, it would "undermin[e] the integrity of the judicial process." *New Hampshire,* 532 U.S. at 755, 121 S.Ct. 1808.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**